**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gowan Company, LLC; Canyon Group, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> Aceto Agricultural Chemicals, <br><br> Defendant. | No. CV-09-1124-PHX-JAT <br><br> **ORDER** |

Upon consideration of Plaintiff's Motion for Preliminary Injunction (Doc. #14), the Court finds:

### **FINDINGS OF FACT**

1. Plaintiff Gowan Company is a family-owned company located in Yuma, Arizona that develops, formulates, and markets crop protection products including the halosulfuron herbicide products at issue in this action. Gowan Company develops, formulates, and markets halosulfuron products on behalf of Plaintiff Canyon Group, which is a joint venture between Gowan Company and Nissan Chemical Industries. Plaintiffs Gowan Company and Canyon Group are referred to collectively as "Gowan."

2. Halosulfuron is a herbicide that selectively targets broadleaf weeds and nutsedges and is approved for use on a wide variety of agricultural crops and turf. The halosulfuron products marketed by Gowan include Sandea®, which focuses on smaller

1 specialty crops, such as vegetables, cucumbers, squash, and melons, and Permit®, which
2 targets larger row crops including rice, corn, cotton, and grain sorghum. The rice use is the
3 biggest market for halosulfuron, accounting for approximately 80% in overall halosulfuron
4 sales.

5     3.    Halosulfuron product sales account for $28 million out of the $7.8 billion in
6 yearly United States pesticide sales.

7     4.    Out of the 20 pesticide active ingredients in Gowan's portfolio, halosulfuron
8 is the best-selling pesticide in terms of volume and sales, and accounts for approximately
9 20% of Gowan's sales.

10     5.    The first registrations allowing use of halosulfuron herbicide products in the
11 United States in 1994 were obtained by Monsanto Company ("Monsanto"), including a
12 registration for the Permit® halosulfuron product. Gowan became involved in the
13 halosulfuron market in 2000, developing the Sandea® product for new uses for halosulfuron
14 on specialty crops, and eventually taking over the Permit® product as well.

15     6.    Gowan and its predecessor Monsanto engaged in the process of drafting the
16 halosulfuron labels, submitting the labels to the United States Environmental Protection
17 Agency ("EPA") for approval, and revising the labels to refine and expand the approved uses
18 of the products.

19     7.    Defendant Aceto Agricultural Chemicals Corporation ("Aceto") sources,
20 markets and sells chemical, pharmaceutical, and crop protection products. Generally, Aceto
21 provides "generic" pesticide products, that is, products that enter the market some years after
22 an initial producer has been selling the pesticide.

23     8.    Aceto recently obtained approval for and began marketing its own generic
24 halosulfuron products, Halomax and Profine, in competition with Gowan's Permit® and
25 Sandea® products.

26     9.    Around 2007, Aceto decided to launch a generic alternative to Gowan's
27 Permit® and Sandea® products, beginning the steps of sourcing raw material and registering
28 its halosulfuron products with the EPA.

10. At the time Aceto entered the halosulfuron market, Gowan was the sole seller of halosulfuron products in the United States. Aside from Aceto, Gowan is still the sole seller of halosulfuron pesticide products in the United States. Gowan exercised the full period of exclusive product rights for its halosulfuron products afforded through patent law and EPA statutory exclusivity provisions.

11. All pesticides sold in the United States must be registered and approved by the EPA. No pesticide product may be sold in the United States without a label that has been submitted to and approved by the EPA for review pursuant to the Federal Insecticide Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136a et seq., which governs the sale, distribution, and use of pesticides.

12. The registration process requires applicants to submit numerous scientific studies regarding the effects of the pesticides and to submit proposed labeling. Once a particular pesticide has been approved, subsequent applicants may seek registration under the "me-too" or "follow-on" registration process. This process is governed by FIFRA § (c)(7)(A).

13. Pursuant to FIFRA, the EPA is required to process me-too applications in 90 days.

14. Me-too applicants are not required to submit de novo scientific studies, but instead may rely on the original registrant's study data. Under the "cite-all" method, a me-too applicant provides a general citation to information already contained in the EPA's files. The me-too applicant must offer to compensate the original registrant according to the statutory data compensation scheme.

15. In June 2008, Aceto applied to the EPA for a "me-too" registration of its halosulfuron products pursuant to FIFRA §§ (c)(3)(B) and (c)(7)(A). Aceto's halosulfuron products are identical to Gowan's products in composition and in usage. Pursuant to FIFRA, Aceto used the "cite all" option of relying on the test data previously submitted by Gowan's predecessors (Nissan and Monsanto), which included a general offer to pay compensation to Gowan for the right to rely on its data. Aceto's halosulfuron registrations were approved

on December 15, 2008.

16. The parties engaged in extended discussions and negotiations concerning the amount of payment, including the initiation of arbitration in November, 2008. In February, 2009, the parties discussed the data compensation issue. Aceto and Canyon finalized an agreement dated April 10, 2009 (the "Data Compensation Agreement") to resolve Aceto's data compensation obligations to Canyon with Aceto agreeing to pay $3.75 million to Gowan.

17. The Data Compensation Agreement covered only compensation for data listed on Exhibit 1 to that Agreement.

18. The Data Compensation Agreement did not cover licensing of any of Gowan's copyrights.

19. This year is Aceto's first year in the halosulfuron market.

20. Aceto has sold products to three of the five distributors in the United States that control about 80% of the entire U.S. pesticide market.

21. Two of these distributors are the same companies that distribute Gowan's halosulfuron products.

22. Aceto's profit margin on halosulfuron is roughly 60%. By the hearing date, Aceto had sold $3.8 million of halosulfuron product, roughly 75% of its inventory for the year, and had $992,401 in gross revenue of product in inventory ready to be sold.

23. Aceto estimates that 50% of the product could remain in the hands of the distributors, which would represent $1,918,418 in unsold product.

24. Several other pesticide companies sell products other than halosulfuron, which compete with Gowan's halosulfuron products for a market share in certain crop markets and certain weed markets.

25. The timing of the rice season varies each year due to weather, in particular, but the season generally begins in March and, this year, will probably continue through the end of July.

26. Through a response to a Freedom of Information Act ("FOIA") request to the

- 4 -

1  EPA, Gowan obtained a copy of Aceto's master-end use label at the end of February 2009.

2  27. After reviewing the label, Gowan's representatives, including Ms. Julie Butcher, immediately noticed the identical similarities between Aceto's and Gowan's label.

4  28. If Gowan had pursued its copyright interests against Aceto or Aceto had known of Gowan's intent to assert its protectable interests prior to Aceto's first sales in March, Aceto would have refrained from selling their product to their distributors until a resolution had been reached that would not have interfered with the distributors' course of business. (Prelim. Inj. Tr. 330:24-331:8.)

9  29. Gowan and Canyon own valid and registered copyrights in their current and prior editions of the Sandea® and Permit® pesticide labels.

11 30. Gowan registered its current Permit® and Sandea® labels with the Copyright Office in August 2007. Gowan registered prior editions of its Permit® and Sandea® labels with the Copyright Office on May 12, 2009, and received notice that the registrations had been filed on May 26, 2009.

## PROCEDURAL HISTORY

Gowan filed this action on May 28, 2009, and notified Aceto on that date of its allegations of copyright infringement. Gowan filed its Application for TRO and Preliminary Injunction a week later, on June 4, 2009. (Docket No. 14.) The Temporary Restraining Order Hearing was held on June 8, 2009, and the Court declined to enter a temporary restraining order. (Docket No. 30.) Instead, the Court ordered that a Preliminary Injunction Hearing be held promptly. (Docket No. 32.) Plaintiffs and Defendant presented their evidence at the Preliminary Injunction Hearing on June 25 and 26, 2009. Gowan and Canyon now seek a preliminary injunction to protect their copyrights and to prevent Aceto from further violating federal copyright law.

## CONCLUSIONS OF LAW

Jurisdiction and Venue

The Court has personal jurisdiction over the parties to this action. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a). Venue is

1 | proper in this judicial district proper to 8 U.S.C. § 1391.

Preliminary Injunction

To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) a balance of equities tips in the favor of the moving party; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, --- U.S. ----, 129 S.Ct. 365, 376 (2008). Traditionally, injunctive relief was also appropriate under an alternative "sliding scale" test. *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir.2008). However, the Ninth Circuit overruled this standard in keeping with the Supreme Court's decision in *Winter*. *American Trucking Ass'ns Inc. v. City of Los. Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (holding that "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable").

Irreparable Harm

Following the Supreme Court's ruling in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), this Court abandoned the presumption of irreparable harm upon a finding of copyright infringement in requests for injunctions. *Designer Skin, LLC v. S & L Vitamins, Inc.* 2008 WL 4174882, at *3 (D. Ariz. 2008). *See also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.Supp.2d 1197, 1210 (C.D. Cal. 2007). The Supreme Court's more recent decision in *Winter* and the Ninth Circuit's ruling in *American Trucking* further confirmed that irreparable harm should no longer be presumed. *See Jacobsen v. Katzer*, 609 F.Supp.2d 925 (N.D. Cal. 2009).

Because *Winter* requires that irreparable harm be imminent, any significant delay in pursuing an injunction is relevant in determining whether injunctive relief is necessary. *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir.1985); *Lydo Enters. v. Las Vegas*, 745 F.2d 1211, 1212 (9th Cir. 1984) (holding that a preliminary injunction is "sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights"). *See also Fogerty v. Poor Boy Prods., Inc.*, 124 F.3d 211, 1997 WL 579175, at *3 (9th Cir. 1997) (ruling that the delay of more than a year in applying for a

1 preliminary injunction seriously undermined plaintiff's claim of irreparable injury); *Gilder v. PGA Tour, Inc.* 936 F.2d 417, 423 (9th Cir. 1991) (ruling the plaintiff's pursuit of action after four months was sufficiently diligent and did not undermine a claim of irreparable harm).

Copyright in a work created on or after January 1, 1978, subsists from the moment of its creation. 17 U.S.C. § 302. While registration is not a prerequisite to having a protectable interest in a work, it is generally required to initiate an infringement suit. *See* 17 U.S.C. §§ 408(a) and 411(a). However, "section 411 does not limit the remedies a court can grant. Rather, the Copyright Act gives courts broad authority to issue injunctive relief." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1154 n.1 (9th Cir. 2007). *See also* 17 U.S.C. § 502(a). "Once a court has jurisdiction over an action for copyright infringement under section 411, the court may grant injunctive relief to restrain infringement of any copyright, whether registered or unregistered." *Perfect 10*, 508 F.3d at 1154 n.1.

Gowan's delay in seeking legal remedy undermines the imminence of the irreparable harm that Gowan alleges. Gowan was put on notice that Aceto encroached on its protectable interests by at least February, when Gowan's senior registration specialist, Ms. Butcher, became aware of the identical similarities between Aceto's and Gowan's labels. At that time, Gowan's Permit® and Sandea® labels were registered by the Copyright Office, and Gowan could have initiated suit over those interests. Even though its prior labels were not yet registered, Gowan did have a right of action under section 411 because its Sandea® and Permit® labels were registered by the Copyright Office in 2007, which would have given the Court authority over those copyrights and the discretion to grant injunctive relief over the unregistered labels as well. *See Perfect 10*, 508 F.3d at 1154 n.1.

But Gowan filed this action three months later, which, in context, represents three fifths of this year's sales season. Additionally, Gowan had time prior to the beginning of the sales season to assert its interests against Aceto. Moreover, Aceto would not have sold its product to its distributors if Gowan had brought suit before the beginning of the season. Thus, the Court concludes that Gowan's delay prior to the sales season and throughout a

significant majority of the sales season undermines Gowan's imminence argument. Accordingly, Gowan's allegation of irreparable harm is undermined by its delay in filing its complaint.

The *Winter* standard requires the plaintiff to demonstrate that irreparable harm is real, imminent and significant– not merely speculative or potential– with admissible evidence and a clear likelihood of success. 129 S.Ct. at 374. Harm is irreparable when it cannot be remedied except through injunctive relief. *Designer Skin, LLC* , 2008 WL 4174882, at *5; *Grokster*, 518 F.Supp.2d at 1210 (noting differences between cases). Economic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award. *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (holding that "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury. . . . The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm")). Equitable remedies, such as injunctive relief, are not available if an adequate remedy at law exists. *Id.*

The jeopardy to a company's competitive position caused by copyright infringement may satisfy the requirement of irreparable harm needed to support a preliminary injunction. *Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521, 525-26 (9th Cir. 1984); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240 (3rd Cir.1983) (holding that "[e]ven without [the] presumption of irreparable harm generally applied in copyright infringement actions, jeopardy to [a copyright holder's] investment and competitive position caused by [a competitor's] wholesale copying . . . would satisfy the requirement of irreparable harm needed to support [a] preliminary injunction"). However, pursuant to *Winter,* the plaintiff must demonstrate this harm with admissible evidence and with a clear likelihood of success that the harm is real, imminent and significant. 129 S.Ct. at 374. *See also Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir.1987) (holding that "temporary economic loss alone generally is not a basis for injunctive relief").

Similarly, the threat of loss of prospective customers, goodwill, or reputation may

support a finding of irreparable harm, so long as it is not too speculative. *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.1991) (noting that damage to the reputation or goodwill, because it is difficult to calculate, qualifies as irreparable harm); *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) (accepting the "threatened loss of prospective customers or goodwill may certainly support a finding of the *possibility* of irreparable harm") (emphasis added). Damages to goodwill and reputation have typically supported findings of irreparable harm only where evidence clearly supports such damage. *See MDY Indus., LLC v. Blizzard Entm't, Inc.,* --- F.Supp.2d ----, 2009 WL 223631, at *13 (D. Ariz. 2009) (finding 500,000 customer complaints about a defendant sufficiently established irreparable injury to the plaintiff's reputation and goodwill); *see also Goldie's Bookstore v. Sup. Ct.*, 739 F.2d 466, 472 (9th Cir.1984) (rejecting plaintiff's claim of loss of goodwill and "untold" customers as too speculative).

Gowan's allegations that it has suffered irreparable harm in the form of lost market share, customer relationships, and goodwill are unpersuasive in light of the evidence presented at this stage. Gowan relies on Aceto's sales figures and movement of product still within the distribution chain to support their claim of substantial harm from lost sales and market share. Gowan has not introduced any of its own evidence of actual lost Gowan sales.

The allegation that Aceto's sales and inventory represent a market share that would otherwise belong to Gowan is unsubstantiated and presumes facts not in evidence. The market share that Aceto captured may be accredited to a number of different factors, which include the expansion of the market or decrease in Gowan's own product distribution. Absent evidence demonstrating a clear likelihood that Aceto's sales figures equate to losses incurred by Gowan, the Court cannot find that Gowan has met its burden of demonstrating that it suffered irreparable harm by way of lost market share. Even if Gowan had demonstrated loss of actual sales, those lost sales are quantifiable and thereby reparable with a later monetary award. If Gowan can be made whole by a monetary damage award, then injunctive relief is inappropriate.

Moreover, Gowan has introduced no evidence of other unquantifiable harm, such as potential damage to customer relationships, reputation or brand recognition.[1] Thus, the Court concludes that Gowan has not provided sufficient evidence to support a finding of irreparable harm.

Balance of Equities

A plaintiff seeking a preliminary injunction must also establish that the balance of equities tips in his favor. *Winter*, 129 S. Ct. at 374 (citations omitted); *see also Continental Airlines v. Intra Brokers, Inc.*, 24 F.3d 1099, 1104 (9th Cir. 1994) (stating that courts should balance hardships between plaintiffs and defendants in considering injunctions). In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 129 S. Ct. at 376-77 (2008) (citations omitted). "Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration[.]'" *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) (internal citations omitted).

The Court concludes that the potential harm to Gowan if the Court denies an injunction is less than the potential harm to Aceto if the Court enters an injunction. As the Court has previously stated, Gowan has not demonstrated that irreparable harm will result if the Court does not enter an injunction. Nor, other than citing to Aceto's sales figures, has Gowan demonstrated the amount of its lost sales. Even assuming that Gowan has lost sales to Aceto, an injunction at this point would save Gowan only from lost sales through the remainder of this month, until the conclusion of this rice season.

On the other hand, if the Court granted an improvident injunction, the Court finds that not only would Aceto suffer potential lost sales for the remainder of the rice season, but Aceto has demonstrated that an injunction could harm its relationships with its distributors,

---

[1]The Court rejected Plaintiffs' attempt to introduce a study that Plaintiffs purport would have supported a claim of potential damage to reputation.

might affect its ability to reemerge into the marketplace next year, and might jeopardize future pesticide product roll-outs. The Court concludes that the harm to Aceto, which potentially has repercussions beyond the current rice season, outweighs Gowan's potential lost sales for this season.[2] The Court therefore finds that the balance of equities tips in the Aceto's favor. The Court will deny the injunction request for the additional reason that Gowan has failed to demonstrate that the equities tip in Gowan's favor.

<u>Likelihood of Success on the Merits and Public Interest</u>

Because the Court has concluded that Gowan has not demonstrated a clear likelihood of irreparable harm nor that the balance of equities tips in Gowan's favor, the Court need not and does not reach a decision as to the likelihood of Gowan's success on the merits or consider the public policy prong of the preliminary injunction standard.[3]

Based on the foregoing findings and conclusions,

IT IS HEREBY ORDERED Denying Plaintiffs' Motion for Preliminary Injunction (Doc. #14).

DATED this 9th day of July, 2009.

_____
James A. Teilborg
United States District Judge

---

[2] Gowan does not dispute that if Aceto had a different, non-infringing label, Aceto could compete with Gowan for halosulfuron market share.

[3] Furthermore, the Court does not reach a determination on the scope of injunctive relief appropriate here, and accordingly does not engage the three prong analysis recently adopted by the Ninth Circuit justifying product recalls, as set forth in *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GMBH & Co.*, No. 08-15101, slip op. at 8204 (9th Cir. July 2, 2009).

- 11 -